UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

LOIS ZIMMERMAN,                                          :
                                                        :
                                    Plaintiff,          :          ____Civ. ____
                                                        :
                    -against-                           :     **COMPLAINT**
                                                        :     **WITH JURY DEMAND**
SHRED-IT, USA, LLC,                                      :
                                                        :
                                    Defendant.          :
                                                        :
------------------------------------------------------------------- X


## **COMPLAINT**

Plaintiff, Lois Zimmerman, by her attorneys, Law Office of Andrea Paparella, PLLC, alleges as follows:

### **THE NATURE OF THE ACTION**

1.      Plaintiff brings this action under: (1) Title VII of the Civil Rights Act of 1964, as amended ("Title VII"); (2) the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-34 ("ADEA"); (3) Title I of the Americans with Disabilities Act of 1990, ("ADA"); (4) the Family and Medical Leave Act, 29 U.S.C. 2601 et seq. ("FMLA"); (5) the New York State Executive Law § 296 et seq. ("New York State Human Rights Law"); and (6) the Administrative Code of the City of New York § 8-101 et seq. ("New York City Human Rights Law").

2.      Plaintiff claims that Defendant discriminated against her on the basis of her age, sex, and disability, retaliated against her for complaining of discrimination, and created a hostile work environment.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action under 28 U.S.C. 1331; 29 U.S.C.  206(d) and 215(a)(3); 42 U.S.C. 1981, and personal jurisdiction over Defendants in this action under New York Civil Practice Law 301 and 302, as Defendants engaged business in New York, and maintained an office in the State of New York in which the events giving rise to this action took place.

4.      Ms. Zimmerman filed a timely Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), and brought the original action within ninety days of receiving from the EEOC a Notice of Right to Sue a true and accurate copy of which is attached as Exhibit A.

5.      Venue is proper under 28 U.S.C.  1391(b)(2), as the Southern District of New York is the judicial district in which a substantial part of the events giving rise to the claims occurred.

## THE PARTIES

6.      Plaintiff Lois Zimmerman is an over-65-year-old woman.  She resides at 110-11 Queens Boulevard, Apartment 26M, Forest Hills, New York, 11375.  She was formerly employed by Defendant Shred-It, USA, LLC ("Shred-it"), as a Sales Executive.

7.      Shred-it, headquartered at 11311 Cornell Park Drive, #125, Blue Ash, Ohio, 45242, is a wholly-owned subsidiary of Stericycle, Inc.  Shred-it's services include paper shredding, hard drive destruction, and online compliance training to meet a business' daily or occasional needs to safely dispose of unwanted or outdated confidential information. Stericycle, Inc. is a public company that employs nearly 17,000 individuals.  It is headquartered at 28161 North Keith Drive, Lake Forest, Illinois, 60045.

2

## FACTS

8.      Ms. Zimmerman is an over-65-year-old woman. She was hired by Shred-it, as a Sales Executive, in or around June 2007.

9.      As a Sales Executive, Ms. Zimmerman worked as an outside sales person.  She traveled to businesses to meet with clients and sell the Company's services.  Ms. Zimmerman's territory consisted of parts of Manhattan, Brooklyn, Staten Island, Long Island, and all of Queens.

10.      Throughout her employment, Ms. Zimmerman performed her job in a professional and competent manner.

### 1.      Ms. Zimmerman Excelled In Her Role At Shred-it

11.      Shred-it employs approximately 250 Sales Executives throughout the U.S. and distinguishes exemplary salespeople with various accolades, such as its Achiever's Club and its President's Club.

12.      Throughout Ms. Zimmerman's tenure, she was recognized by the Achiever's Club multiple times.

13.      Moreover, in 2014, Ms. Zimmerman was one of only 25 Sales Executives to make the President's Club.

14.      From 2014, Ms. Zimmerman has been the only female in her sales group and the only Sales Executive that is not in their twenties or thirties.

15.      Throughout the period leading up to in or around May 2014, Tommy Modica was Ms. Zimmerman's sales manager and she and he enjoyed a good relationship. Mr. Modica was supportive of Ms. Zimmerman's work and repeatedly praised her performance, acknowledging,

among other things, that Ms. Zimmerman was great at breaking through to customers and making them comfortable.

**2.     When Shred-it Acquired Another Company's Shredding Service, Management Changed And Shred-it Discriminatorily Started Taking Ms. Zimmerman's Territory And Giving It To Much Younger, Less Experienced Males.**

16.     In or around May 2014, Shred-it acquired Cintas Corporation's ("Cintas") shredding services.

17.     With the new acquisition came new management from Cintas.  Ms. Zimmerman was assigned to a new Sales Manager, T.J. O'Shea.

18.     In or around June 2014, Ms. Zimmerman was told she could not keep all of her sales territory and that the Company was reassigning chunks of it, per the direction of the new Executive Sales Team members who had come from Cintas.

19.     In an effort to work amicably with new management, Ms. Zimmerman volunteered to give up all of her territory, except Manhattan. The Executive Sales Team, however, took Manhattan away from Ms. Zimmerman and gave it to junior, male, Sales Executives, who were in their early 20's.

20.     Meanwhile, Shred-it had also removed two of the three men who had been successfully covering Manhattan. The two men they removed were both well over fifty years old; the male Sales Executive who remained was a young man in his twenties. Attached hereto as Exhibit A is a demonstrative exhibit illustrating the demographics of the Manhattan territory at year-end 2013, in August 2014 and at year-end 2014.

21.     One of the junior salesmen who was given Manhattan territory, Adam

Umanoff, left the Company about a month later. At this time, Ms. Zimmerman asked if she could have the Manhattan territory that had been assigned to Mr. Umanoff (where Ms. Zimmerman had been working successfully for years) returned to her.

22.     Brian Levitan, another male in his twenties, whom Ms. Zimmerman actually trained, had half of Brooklyn and Staten Island prior to the merger, and was then given a few areas within Manhattan after the merger, and did not have to reapply or interview.

23.     The Company would not return the Manhattan territory to Ms. Zimmerman. Instead, the company required Ms. Zimmerman to reapply for the position by submitting an updated resume and going through a grueling interview process, even though, up to just a month before, Ms. Zimmerman had productively worked Manhattan for roughly six years and had built strong and loyal client relationships there.

24.     Conversely, Shred-it required nothing of the sort from the young men, from both Shred-it and Cintas, to whom it simply assigned the Manhattan territory the prior month.

25.     Ms. Zimmerman's request for Manhattan was refused.  Instead, Shred-it hired a young man in his early twenties, Chris Canon, and gave him it. Moreover, when Mr. Canon was eventually let go for generating very little business, Shred-it did not announce the opening. Instead, the opening was quietly filled it with another young man.

26.     Meanwhile, Ms. Zimmerman saw her territory diminish further. For example, in or around July 2014, Shred-it took away all of the zip codes Ms. Zimmerman worked on Long Island and gave them to a young salesman, Rich Bruckner.  This resulted in Mr. Bruckner having all of Long Island. In addition, Shred-it allowed Mr. Bruckner to keep the Manhattan zip codes he was working before the merger, in stark contrast to Shred-it's requirement that Ms.

Zimmerman give hers up.

27.     Then, in or around January 2015, Shred-it took both Brooklyn and Staten Island away from Ms. Zimmerman and gave them to Tim Christi, a young man in his twenties, from Cintas.  Mr. Christi had not previously worked as a Sales Executive, but instead as an "Inside Sales Person." An "Inside Sales Person" is basically a glorified title used for an office employee who answers telephones and writes orders down.

28.     Later in 2015, Shred-it tried to give the one territory Ms. Zimmerman had left, Queens, to a young, inexperienced, male Sales Executive, Brian Gilbert, who was in his twenties.

29.     In 2015, Mr. Gilbert moved from Florida to Queens.  In Florida, Mr. Gilbert performed various office jobs at a Shred-it branch there and did not have sales experience. After Mr. Gilbert got engaged, he decided he wanted to move to New York and work as a Sales Executive.

30.     Shred-it hired Mr. Gilbert as a Sales Executive for the Bronx.  However, because Mr. Gilbert had moved to Queens when he arrived from Florida, Mr. Modica and Mr. Mazza asked that Ms. Zimmerman take the Bronx and give Mr. Gilbert Queens.  For this move, Ms. Zimmerman did not have to reapply or interview.  Ms. Zimmerman said she would stay in Queens.

31.     Thus, by 2015, Shred-it had reassigned most of Ms. Zimmerman's territory, and she was left with only Queens and one area of Manhattan, Columbia University ("CU").  The reason Ms. Zimmerman retained CU is that CU did not want anyone else at Shred-it servicing its shredding needs.

32.     However, in January of 2016, Shred-it reassigned the zip codes Ms. Zimmerman had for Colombia University to a male salesman, and did not tell her. Ms. Zimmerman found out only because the male salesman who was assigned Columbia mentioned it to her.

33.     Furthermore, not only did Ms. Zimmerman's territory decreased substantially in size, but also in potential. For instance, Manhattan, with its numerous law firms and company headquarters offers far more opportunity to sell shredding services than the mostly small businesses located in Queens. Manhattan also has many businesses located within close range to one and other, whereas businesses in Queens tend to be spread out, making visiting multiple businesses in Manhattan far easier and expeditious than visiting the same number of businesses in Queens.

34.     In addition, a Sales Executive gets 60% of the commissions for all shredding services sold to companies who have their head offices in the Sales Executive's territory, regardless of where the shredding service is provided. The Sales Executive who works the territory where the services occur receives the remaining 40% of the commissions. Because Manhattan far exceeds other territories in home offices, Manhattan is considerably more lucrative.

**3.     After Shred-it Acquired Cintas And Its Management, Ms. Zimmerman Was Assigned A New Sales Manager, Who Needled Ms. Zimmerman About Her Age And Erroneously Reported To Human Resources That Ms. Zimmerman was Disabled.**

35.     In the fall of 2015, Shred-it assigned Ms. Zimmerman a new Sales Manager, Joseph Mazza.  Mr. Mazza is also a young, male, Cintas alum, who was in his twenties at the time.

36.     Mr. Mazza fixated on Ms. Zimmerman's age, constantly asking how old she was.

37.     When Ms. Zimmerman would respond it was none of his business, Mr. Mazza inexplicably replied he needed to know Ms. Zimmerman's age because he was her Sales

7

Manager.

38.     Mr. Mazza then claimed, Ms. Zimmerman looked good for her age, which made no sense, since he purportedly did not know how old Ms. Zimmerman was.

39.     When Ms. Zimmerman still refused to tell him her age,  he menaced that he could find out.

40.     In September 2015, Ms. Zimmerman had a conversation with Mr. Mazza during which she told him she had trouble reading the small font in SalesForce, a new computer program that Shred-it used. Inability to read small font is normal, if not unavoidable, for many people over 40 years of age.

41.     Rather than simply show Ms. Zimmerman how to make the font larger so she could read it, Mr. Mazza couched Ms. Zimmerman's request as a disability in a September 22, 2015 email, copying Human Resources and demanding "information from [Ms. Zimmerman's] doctor that would allow [Shred-it] to determine if [Ms. Zimmerman was] disabled, along with the severity of [Ms. Zimmerman's] functional limitations."

42.     Ms. Zimmerman was shocked. Ms. Zimmerman told Mr. Mazza she was upset he had gone to Human Resources against her wishes, that she did not consider her normal, age-related, loss of near focusing ability to mean she was disabled, and did not appreciate Human Resources evaluating if she was – Ms. Zimmerman simply needed the font size increased in SalesForce.


**4.     Shred-it Again Favored A Young, Inexperienced Man Over Ms. Zimmerman.**

43.     In 2016, territory in Manhattan opened up yet again, when Mike Reidy, another male Sales Executive, in his twenties, left the Company.

44.     After Mr. Reidy left, in or around May, 2016, Ms. Zimmerman met with Regional Director Chris Ward and, again, requested Manhattan back.

45.     Again, Ms. Zimmerman was rebuffed and the territory went to Joseph DeLutrie, a male in his twenties, who had been working as an "Inside Sales Person" (i.e., answering phones in the office).

**5.      In The  Fall  Of  2015, Ms. Zimmerman's Doctor Diagnosed Her With  Breast Cancer.  Upon Completing FMLA Leave For Cancer Treatment, Mr. Mazza Put Ms. Zimmerman On A Performance Improvement Plan ("PIP").**

46.     In January 2016, Ms. Zimmerman was diagnosed with breast cancer.

47.     As a result, in February 2016, Ms. Zimmerman had an operation which was followed by weeks of radiation treatment.

48.     In order to undergo cancer treatment, Ms. Zimmerman took FMLA leave between March 1, 2016 and April 30, 2016.

49.     Always a hard worker, Ms. Zimmerman only took intermittent leave to cover her doctors' appointments and treatments.  In fact, Ms. Zimmerman went to work after treatment sessions, despite having undergone radiation and enduring it's less-than-pleasant side effects, which left Ms. Zimmerman fatigued and ill.

50.     Mr. Mazza minimized Ms. Zimmerman's cancer and its treatment, inappropriately commenting to her that it was only about an hour a day, ignoring her travel time and dismissing the grueling side effects that Ms. Zimmerman suffered.

51.     The first week following Ms. Zimmerman's return to full-time, from intermittent FMLA leave, on Friday, May 6, 2016, Mr. Mazza presented Ms. Zimmerman with a Performance Improvement Plan ("PIP").

9

52.     The PIP threatened Ms. Zimmerman's employment because her sales numbers were lower - than they had been historically - during the period immediately before her cancer diagnosis and the subsequent period she was on intermittent FMLA leave for treatment.

53.     In addition, Ms. Zimmerman's numbers were lower as a result of Shred-it giving almost all of her territory to younger salesmen over the past couple of years.

54.     The PIP Mr. Mazza gave Ms. Zimmerman directed her to improve within 30 days, which is one-third the time the Company gives young, male employees who are given PIPs. Shred-it provides them with 90 days to improve.


**6.      Ms. Zimmerman Submits An Internal Complaint.**

55.     On May 14, 2016, Ms. Zimmerman submitted a written complaint of Shred-it's discriminatory treatment of her to the Company's in-house counsel, Brenda Frank.

56.     In Ms. Zimmerman's internal complaint, she stated she had suffered, and continued to suffer, retaliation based on the FMLA leave she took as well as discrimination based on her sex, disability, and age. Ms. Zimmerman relayed the Company's discriminatory actions of reassigning her accounts to younger, less experienced men, singling her out to reapply for territory that was hers for years, and the retaliation Ms. Zimmerman faced after FMLA leave.

57.     Ms. Frank responded by email later that day and explained Ms. Zimmerman's complaint had been submitted to Shred-it's Human Resources department and that a team member from the Human Resources department would be reaching out to Ms. Zimmerman on Monday.

**7.      Shred-it Purported To "Investigate" Ms. Zimmerman's Complaint And Provided Blatant, Pretextual, Reasons For Its Discriminatory Behavior.**

58.      On the morning of Monday, May 16, 2016, Herman Wisdom, from Shred-it's Human Resources department, called and emailed Ms. Zimmerman to set up a telephone call about her complaint.

59.      Later that day, at around 3 p.m., Ms. Zimmerman spoke over the phone with Mr. Wisdom. Ms. Zimmerman answered Mr. Wisdom's questions and relayed the discriminatory and retaliatory behavior she had been experiencing at Shred-it.

60.      On June 2, 2016, Mr. Wisdom sent Ms. Zimmerman a letter summarizing his "investigation" into Ms. Zimmerman's formal complaint (the "Report").

61.      The Report provided Ms. Zimmerman's sales numbers for the period of September 2015 through April 2016 and claimed that Ms. Zimmerman was not given the PIP based on discriminatory or retaliatory reasons when she returned from intermittent FMLA leave, but because Ms. Zimmerman's numbers were low during the period presented in the Report.

62.      The Report failed to address any of the facts relevant to the period, which Ms. Zimmerman had supplied in her internal complaint, and when Mr. Wisdom interviewed her over the telephone.

63.      For example, the Report disregarded that Ms. Zimmerman had cancer during that period, underwent cancer treatment over the last two months of that period, and had nearly all of her territory discriminatorily taken from her and given to young, male employees prior to that period.

64.      The Report instead glaringly omitted any of these factors, of which not only had Ms. Zimmerman made the Company aware, but which were at the crux of Ms. Zimmerman's

internal complaint of discrimination and retaliation. The Report also flatly concluded that Ms. Zimmerman's "sales activity and productivity levels have not been good for some time" to justify putting Ms. Zimmerman on a PIP immediately after the completion of her FMLA leave.

65.    The Report claimed the PIP was "designed to assist in improving [Ms. Zimmerman's] productivity", but did not explain why Shred-it demanded Ms. Zimmerman's numbers improve in just 30 days, when men put on PIPs received 90 days - an issue Ms. Zimmerman also brought up in her internal complaint.

66.    In addition, the Report offered an irrational reason for Ms. Zimmerman's sales territory being reassigned to younger, less experienced sales men.

67.    The Report alleged that when Shred-it merged with Cintas, sales territories were evaluated and assigned based on performance.

68.    The provided reason was obvious pretext.  When the Company reassigned Ms. Zimmerman's territory to the young, male sales people, she was one of the top performing Sales Executives at Shred-it. A fact that is evidenced by Ms. Zimmerman's inclusion in Shred-it's President's Club, an honor the Company bestowed only on its top ten percent of Sales Executives.

69.    Next, the Report gives a roundabout explanation as to why Ms. Zimmerman was asked to reapply and re-interview for her territory, while the young men to whom the Company handed her territory it did not. The Report claims that in cases where the Company assigned a territory to a Sales Executive - as it did with most of Ms. Zimmerman's territory by assigning it to exclusively young, male Sales Executives - then the Sales Executive could enjoy the territory without applying for it.

70.    However, the Report continues, since it had reassigned the Manhattan territory that Ms. Zimmerman had been working for nearly six years, she had to start from the bottom

with Shred-it's application process.

71.     Next, the Report makes a statement that is on its face, false.  It avers: "As a result of the merger, your territorial assignment did not change. You remained responsible for the Queens territory."

72.     Again, this is clear pretext. Ms. Zimmerman's territory changed drastically after the merger.  Ms. Zimmerman was left with Queens and one Manhattan client (who would only work with her following the merger), while the Company stripped her of far more lucrative Manhattan territory, along with the Brooklyn, Staten Island and Long Island zip codes.

73.     The Report then twists the truth about the one Manhattan client Ms. Zimmerman serviced, Columbia University. The Report claimed Shred-it "agreed" to give Ms. Zimmerman this client, implying the Company had obliged her.

74.     This is a misrepresentation. Before Ms. Zimmerman became Columbia's Sales Executive, Columbia was going to change its shredding vendor and, had Ms. Zimmerman not continued servicing Columbia, Shred-it would have likely lost the account entirely.

75.     In fact, Frank Molina, who manages Columbia University's Waste Management, sent Ms. Zimmerman an email on July 16, 2014 that stated:

> I want to take the time out to thank you for all the help you have provided me throughout the last year or so.  Before you came on board, I will be honest, I was ready to switch vendors.  Shred It (sic) was not showing interest in my business.  I could never get service in a timely manner and when we did receive the service it was never right. As I close out this last clean and go green event here on campus which you serviced for 3 days, I can appreciate your involvement in getting this right.
>
> Thanks again for your help and dedication.
>
> Hope things don't change!

13

76.     The Report next alleged Ms. Zimmerman failed to submit medical documentation so that the Company could evaluate whether it could accommodate a "medical issue" of hers. This referred to the conversation Ms. Zimmerman had with Mr. Mazza, in September 2015, which Mr. Mazza, rather than provide simple assistance, turned into a Human Resources inquiry, when Ms. Zimmerman merely asked how to increase font size.

77.     The Report concluded, that "the investigation of your concerns has been completed, and it has not yielded substantiation of the allegations that we discussed."


**8.      Shred-it Further Retaliated By Giving Ms. Zimmerman Another PIP With
Impossible Requirements.**

78.     On July 11, 2016, Mr. Mazza gave Ms. Zimmerman another PIP.

79.     At this time, Shred-it had been transitioning its computer applications and email to Stericycle 's system.  This caused numerous IT issues and resulted in Ms. Zimmerman having no access to email, having all of her email messages deleted, and allowed her no access to SalesForce, all for nearly four weeks.

80.     Ignoring these facts, of which Shred-it was well aware, the PIP criticized Ms. Zimmerman's failure to use SalesForce in the recent weeks and Ms. Zimmerman's numbers (which had been lower as a result of her territory being taken away, her illness and then the IT issues).

81.     The PIP then instructed Ms. Zimmerman to improve her performance and laid out goals which were not possible, and which Shred-it required of no one else.

82.     For example, Ms. Zimmerman was to conduct a minimum of 40 "cold calls" per week and turn in at least 40 new business cards per week to Mr. Mazza. What Shred-it means by "cold call"

is that Ms. Zimmerman was to physically meet with at least 40 new potential clients per week, at their places of business. Shred-it demanded the weekly business card quota as proof of Ms. Zimmerman's compliance. Time-wise, this activity alone would not be possible to do in the work week that the PIP dictated Ms. Zimmerman work. In what the PIP called the "Golden Hours" of 8:00 a.m. through 5:00 p.m., Monday through Friday, Ms. Zimmerman would have to travel to, and conduct, at least eight separate new meetings, at eight separate locations, per day.

83.     Moreover, from the 40 "cold calls" Ms. Zimmerman was expected to secure at least 11 new "appointments." "Appointments" are formal presentations to new prospects, made at their place of business, regarding Shred-it's services.

84.     In addition, Ms. Zimmerman was told to be in the office Mondays and Wednesdays at 7:30 a.m. On these days, from 7:30 a.m. to 8:30 a.m., Ms. Zimmerman was to have a meeting, followed by a "Phone Block" session from 8:30 a.m. to noon (12:00 p.m.). During this time, she was to make at least 60 calls. This quota was simply not possible in the prescribed timeframe, particularly if Ms. Zimmerman were to have actual conversations with the people she was calling. Moreover, the time it would take to get to the office in Westbury, Long Island, sit for the "Phone Block" and then travel back to Ms. Zimmerman's territory in Queens ate into Ms. Zimmerman's sales time, the time in which Ms. Zimmerman was to achieve the 40 plus "cold calls," and the time Ms. Zimmerman was to deliver at least 11 "presentations."

85.     Furthermore, among other things, the PIP required Ms. Zimmerman to travel from Queens to Shred-it's Long Island office every Friday morning for an 8:30 a.m., hour-long meeting with Mr. Mazza.

15

**9.     Following The Dissatisfactory Investigation Into Ms. Zimmerman's Internal Complaint, And The Further Retaliation That Followed, Ms. Zimmerman Sent A Draft Of Her EEOC Charge To Ms. Frank For Respondents To Review.   This Resulted In Increased Retaliation.**

86.     On July 29, 2016, through counsel, Ms. Zimmerman sent a draft of her EEOC Charge, containing the above details, to Ms. Frank for Shred-it and Stericycle to review.

87.     Following receipt of Ms. Zimmerman's draft Charge, Respondents' retaliatory treatment of her escalated.

88.     For example, Mr. Mazza became more and more hostile and abusive toward Ms. Zimmerman.  Mr. Mazza would speak to Ms. Zimmerman as if she were a child, accuse her of wrongdoing, and humiliate her in front of her peers, among other things.

89.     Mr. Mazza's attitude toward Ms. Zimmerman became an ever-increasing annoyance for her. The term that came to Ms. Zimmerman's mind, to explain Mr. Mazza's attitude, was the Yiddish term "hoyker," which means Mr. Mazza treated Ms. Zimmerman as if she was a boil on his back, so burdensome as to cause him to hunch.

90.     Moreover, at the end of August 2016, Ms. Zimmerman discovered that Mr. Mazza was tracking her through the GPS on her cell phone. When Ms. Zimmerman noticed that someone had turned on location tracking on her cell phone, permitting Mr. Mazza to access her whereabouts, Ms. Zimmerman turned it off.

91.     Ms. Zimmerman was not aware of any policy allowing Shred-it to track her through GPS, nor was Ms. Zimmerman aware of Shred-it tracking anyone else in this manner.

92.     In mid-October 2016, Ms. Zimmerman arrived to a 7:30 a.m. meeting with Mr. Mazza and some of her colleagues at 7:31 a.m.  Mr. Mazza reprimanded Ms. Zimmerman for

16

being one minute late. Ms. Zimmerman was routinely punctual, while some of the men were routinely, and more substantially, late. Mr. Mazza did not, however, humiliate or make examples out of them.

93.    Ms. Zimmerman explained to Mr. Mazza that there had been a lot of traffic that morning and asked him why he made an example out of her because she was one minute late, and did not do this to other members of the sales team when they arrived significantly later.

94.    Ms. Zimmerman brought up Mr. Christi, who recently arrived around 20 minutes late to a sales meeting and was not reprimanded. Mr. Mazza claimed that Mr. Christi also had traffic issues but that when Mr. Christi was driving, and realized he would be late, he sent Mr. Mazza a text message explaining his tardiness.

95.    Ms. Zimmerman said she was not willing to text and drive.

96.    The sales team routinely met on Monday morning. At Monday morning meetings, all Sales Executives put their numbers from the previous week up on a board and then would individually standup, before the group, to talk about how our previous weeks had gone.

97.    On October 31, 2016, Ms. Zimmerman attended a Monday morning sales meeting with Mr. Mazza and the other Sales Executives on her team. When Ms. Zimmerman put her numbers on the board Mr. Mazza said he saw nothing in the system, inferring she was being untruthful in front of the team. When Ms. Zimmerman stood up to talk, Mr. Mazza stopped her, and ordered her to "just go and sit down," as if she were a misbehaving child. Ms. Zimmerman's team members who witnessed this either looked stunned or looked away. Moreover, after this meeting, three Sales Executives who were in the meeting approached Ms. Zimmerman separately and expressed that they could not believe how badly Mr. Mazza treated her, and at least one described Mr. Mazza's treatment of Ms. Zimmerman as "outrageous."

98.     Over Ms. Zimmerman's nearly ten years as a Sales Executive, she had good relationships with everyone she came in contact with, and her coworkers always treated her with respect. In fact, Ms. Zimmerman trained some of the young, male, Sales Executives that came on board both before and after Cintas merger.  These young men asked Ms. Zimmerman for advice and held her in high-esteem.

99.     Mr. Mazza, however, humiliated Ms. Zimmerman to the point where she became embarrassed and ashamed around her coworkers.

100.    After the Monday sales meetings, Mr. Mazza would meet with each Sales Executive individually.  Mr. Mazza would spend approximately 30 to 45 minutes with each of the young, male, Sales Executives on Ms. Zimmerman's team, but usually only about 10 minutes with her.

101.    After the meeting on Monday, October 31, 2016, when Ms. Zimmerman met individually with Mr. Mazza, he erroneously alleged that Ms. Zimmerman routinely put false numbers on the board during the Monday sales meetings and offered the number she had put on the board that morning as an example.

102.    Ms. Zimmerman was offended and astonished. Ms. Zimmerman has always been straightforward and holds her honesty in high regard. In Ms. Zimmerman's nearly decade of employment with Shred-it, no one had ever before questioned her integrity.

103.    Ms. Zimmerman told Mr. Mazza that she never fudged numbers and explained that she could show him the record supporting the number she had put on the board that morning. He was not interested in proof, only saying he had not seen it in SalesForce.

104.    He then accused Ms. Zimmerman of fudging the numbers she put on the board at the previous week's Monday meeting, on October 24, 2016. However, the previous week, Ms.

Zimmerman did not put any numbers on the board, as she took Monday, October 24, 2016 as a vacation day and was not in the meeting, which Ms. Zimmerman told him.

105.    Mr. Mazza refused to retract his insulting and untrue accusations. Instead, his abusive and humiliating treatment of Ms. Zimmerman continued, resulting in her work environment increasing in hostility with each passing day she was at Shred-it.

**10.    Shred-it Terminated Ms. Zimmerman For Pre-Textual Reasons.**

106.    On January 13, 2017, Shred-It terminated Ms. Zimmerman employment.

107.    Shred-it memorialized the termination in a letter stating that the reasons for termination were because Ms. Zimmerman "failed to meet the minimal performance standards for her position," referring to the PIP goals Shred-it had given Ms. Zimmerman.

108.    As discussed above, Ms. Zimmerman was unable to meet the patently impossible goals outlined the PIPs Shred-it gave her. The goals set could not be accomplished in the time period Shred-it allowed, especially considering Ms. Zimmerman's territory has been wrongfully reduced from covering four boroughs and Long Island, New York, to covering one borough, Queens, with drastically less shredding needs than the others.

**FIRST CLAIM**

**(Sex Discrimination, Under Title VII of the Civil Rights
Act of 1964 Against Shred-it)**

109.    Ms. Zimmerman repeats and realleges the allegations contained above as if separately set forth herein.

110.     At all relevant times, Ms. Zimmerman was an "employee" of Shred-it under Title VII, 42 U.S.C. § 2000e(f).

111.     Upon information and belief, Shred-it is an "employer" under Title VII, 42 U.S.C. § 2000e(b).

112.     By its actions described above, Shred-it unlawfully discriminated against Ms. Zimmerman on the basis of her sex, in violation of Title VII.

113.     As a result of Shred-it's discriminatory conduct, Ms. Zimmerman has suffered substantial damages including back pay, front pay, and emotional pain and mental anguish, in an amount to be determined at trial.

114.     Upon information and belief, Shred-it's discriminatory conduct was engaged in with malice and/or reckless indifference to Ms. Zimmerman's rights.  Ms. Zimmerman is therefore entitled to punitive damages under Title VII.


**SECOND CLAIM**

**(Retaliation For Complaining Of Sex Discrimination,
Under Title VII of the Civil Rights Act of 1964)**

115.     Ms. Zimmerman repeats and re-alleges the allegations contained above as if separately set for herein.

116.     At all relevant times, Ms. Zimmerman was an "employee" of Shred-it under Title VII, 42 U.S.C. § 2000e(f).

117.     Upon information and belief, Shred-it is an "employer" under Title VII, 42 U.S.C. § 2000e(b).

118.     By their actions described above, Shred-it has unlawfully retaliated against Ms. Zimmerman for complaining of sex discrimination, in violation of Title VII.

## THIRD CLAIM

### (Disability Discrimination in Violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq.)

115.     Ms. Zimmerman repeats and re-alleges the allegations contained above as if separately set for herein.

116.     At the time Shred-it failed to accommodate Ms. Zimmerman, she suffered from cancer.

117.     Ms. Zimmerman's disability substantially limited, and currently limits a major life activity, working.

118.     Shred-it regarded and perceived Plaintiff to be disabled.

119.     Ms. Zimmerman was at all times qualified for her position.

120.     Ms. Zimmerman was able to perform the essential functions of her job with reasonable accommodation.

121.     Ms. Zimmerman excelled at her job, prior to her disability and would have been able to continue to excel, if Shred-it had reasonable accommodations for her, which she requested.

122.     Ms. Zimmerman needed to have reasonable accommodations to allow her to perform her essential duties and the accommodations she requested did not place an undue hardship on Shred-it.

123.     Shred-it discriminated against Ms. Zimmerman by failing to grant her, harassing her, and ultimately terminating her employment.

124.     As a proximate result of Shred-it's discrimination against Ms. Zimmerman on the basis of her disability, Ms. Zimmerman has suffered and continues to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation, and other employment benefits.

21

125.    As a further proximate result of Defendant's actions, Ms. Zimmerman has suffered and continues to suffer impairment and damage to Plaintiff's good name and reputation by Shred-it.

126.    As a further proximate result of Crunch's actions, Plaintiff has suffered and continues to suffer severe and lasting embarrassment, humiliation and anguish, and other incidental and consequential damages and expenses.

127.    Shred-it's conduct was outrageous and malicious; was intended to injure Ms. Zimmerman; and was done with reckless indifference to Ms. Zimmerman's protected civil rights, entitling her to an award of punitive damages.

## FOURTH CLAIM

### (Retaliation Under The ADA)

128.    Ms. Zimmerman repeats and re-alleges the allegations contained above as if separately set for herein.

129.    Ms. Zimmerman opposes Defendant's unlawful, discriminatory employment practices and engaged in protected activity under the ADA.

130.    As described above, Shred-it retaliated against Ms. Zimmerman for having engaged in protected activity.

131.    Shred-it's actions constitute discrimination and retaliation against Ms. Zimmerman in violation of the ADA.

132.    As a result of Shred-it's retaliation, Ms. Zimmerman has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

## FIFTH CLAIM

### (Age Discrimination And Retaliation For Complaining Of Such Discrimination Under the ADEA Against Defendant)

133.     Ms. Zimmerman repeats and realleges the allegations contained above as if separately set forth herein.

134.     Ms. Zimmerman was an "employee" of Shred-it under ADEA, 29 U.S.C. § 630(f).

119.     Shred-it is an "employer" under ADEA, 29 U.S.C. § 630(b).

120.     By their actions described above, Shred-it engaged in unlawful employment practices in violation of ADEA, 29 U.S.C. §§ 623(a), (c), by discriminating against Ms. Zimmerman with respect to his compensation, terms, conditions, or privileges of employment because of her age.

121.     In addition, Shred-it's conduct was in violation of ADEA, 29 U.S.C. § 623(d), by retaliating against Ms. Zimmerman because she complained of discrimination.

122.     The unlawful practices complained of above were and are willful within the meaning of ADEA, 29 U.S.C. § 626(b).

123.     As a result of the discrimination and retaliation described above, Ms. Zimmerman has suffered substantial loss of earnings and benefits, and she will continue to do so in the future. Accordingly, Shred-it is liable to Ms. Zimmernan for back pay in an amount to be determined at trial, liquidated damages, mental and emotional anguish, plus interests and costs.

## SIXTH CLAIM

### (Gender, And Age Discrimination Under The New York State Human Rights Law)

135.     Ms. Zimmerman repeats and realleges all of the allegations contained herein, as if

separately alleged.

136.    Ms. Zimmerman is an over-sixty-year-old woman.

137.    From in or around June, 2007 until January 13, 2017, Ms. Zimmerman was employed by Shred-it as a Sales Executive.

138.    By its actions detailed above, Shred-it unlawfully discriminated against Ms. Zimmerman on the basis of her gender and age in violation of the New York State Human Rights Law.

139.    Upon information and belief, Shred-it's conduct toward Ms. Zimmerman was intentional discrimination.

140.    As a result of the intentional discrimination, Ms. Zimmerman has experienced significant damages in an amount to be determined at trial.


### SEVENTH CLAIM

**(Hostile Work Environment Under The
New York State Human Rights Law)**

141.    Ms. Zimmerman repeats and realleges all of the allegations contained herein, as if separately alleged.

142.    By its actions detailed above, Shred-it created an abusive working environment permeated with discriminatory intimidation, ridicule and insult which was so severe and pervasive as to alter the conditions of Ms. Zimmerman's employment.

143.    These actions were perpetrated by Ms. Zimmerman's supervisors, and Shred-it acquiesced to this behavior by failing to take action in response to Ms. Zimmerman's complaints, as detailed above.

144.     Upon information and belief, Shred-it's conduct towards Ms. Zimmerman was intentional discrimination.

145.     As a result of this hostile work environment, Ms. Zimmerman suffered severe emotional distress, and damages, in an amount to be determined at trial.


## EIGHTH CLAIM

### (Retaliation Under The New York State Human Rights Law)

146.     Ms. Zimmerman repeats and realleges all of the allegations contained herein, as if separately alleged.

147.     Ms. Zimmerman submitted an internal complaint, as well as a Draft EEOC Charge, to Shred-it's in-house counsel (Brenda Frank) as detailed above, regarding the discrimination and hostile work environment she experienced, which were violations of the New York State Human Rights Law.  This was protected activity under the New York State Human Rights Law.

148.     Ms. Frank forwarded Ms. Zimmerman's complaint to Shred-it Human Resources and, because of this, Shred-it was aware that Ms. Zimmerman had engaged in this activity.

149.     In response to Ms. Zimmerman's complaints, Shred-it subjected Ms. Zimmerman to adverse employment actions, including issuing Ms. Zimmerman two different "Performance Improvement Plans" ("PIPs").

150.     As a result of this retaliation, Ms. Zimmerman has experienced significant damages in an amount to be determined at trial.

## NINTH CLAIM

### (Gender, And Age Discrimination Under
### The New York City Human Rights Law, § 8-107(1)(a))

151.    Ms. Zimmerman repeats and realleges all of the allegations contained herein, as if separately alleged.

152.    Ms. Zimmerman is a "person" under the New York City Human Rights Law, § 8-102(1).

153.    Shred-it is an "employer" under the New York City Human Rights Law, § 8-102(5) and § 8-107(1)(a).

154.    Upon information and belief, Shred-it unlawfully discriminated against Ms. Zimmerman on the basis of gender and age, entitling her to punitive damages under The New York City Human Rights Law.

155.    As a result of this unlawful conduct, Ms. Zimmerman has suffered significant damages in amount to be determined at trial.


## TENTH CLAIM

### (Hostile Work Environment Under The New York City Human Rights Law)

156.    Ms. Zimmerman repeats and realleges all of the allegations contained herein, as if separately alleged.

157.    By its actions detailed above, Shred-it created an abusive working environment permeated with discriminatory intimidation, ridicule and insult where Ms. Zimmerman was treated less well because of her age and gender.

158.    These actions were perpetrated by Ms. Zimmerman's supervisors, and Shred-it acquiesced to this behavior by failing to take action in response to Ms. Zimmerman's complaints, as detailed above.

159.    Upon information and belief, Shred-it's conduct towards Ms. Zimmerman was undertaken with reckless indifference to Ms. Zimmerman's rights, entitling her to punitive damages under the New York City Human Rights Law.

160.    As a result of this hostile work environment, Ms. Zimmerman suffered severe emotional distress, and other damages in an amount to be determined at trial.


## ELEVENTH CLAIM

### (Retaliation Under The New York City Human Rights Law, §8-107(7))

161.    Ms. Zimmerman repeats and realleges all of the allegations contained herein, as if separately alleged.

162.    Ms. Zimmerman complained to in-house counsel, her supervisors and to Human Resources at Shred-it on multiple occasions, as detailed above, regarding the discrimination, hostile work environment and discrimination she experienced, which were violations of the New York City Human Rights Law.  This was protected activity under the New York City Human Rights Law.

163.    As Ms. Zimmerman complained directly to her managers, in-house counsel and Human Resources, Shred-it was aware that Ms. Zimmerman had engaged in this activity.

164.    In response to Ms. Zimmerman's complaints, Shred-it subjected Ms. Zimmerman to adverse employment actions, including issuing Ms. Zimmerman two different "Performance Improvement Plans" ("PIPs").

165.    These actions deterred Ms. Zimmerman from engaging in protected activity under the New York City Human Rights Law.

166.    Shred-it's actions constitute retaliation against Plaintiff in violation of The New York City Human Rights Law, § 8-107(7).

167.    As a result of this retaliation, Ms. Zimmerman has experienced significant damages in an amount to be determined at trial.


**TWELFTH CLAIM**
**(Aiding And Abetting Under The New York City Human Rights law, § 8-107(6))**


168.    Ms. Zimmerman repeats and realleges all of the allegations contained herein, as if separately alleged.

169.    Defendants' actions set forth above violated § 8-107(6), which sets forth:

> It shall be an unlawful discriminatory practice for any person to aid abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so.


**THIRTEENTH CLAIM**

**(Unlawful Discriminatory Practices Under The New York City Human Rights Law § 8-107(13)(b))**

170.    Ms. Zimmerman repeats and realleges all of the allegations contained herein, as if separately alleged.

171.    Mr. Joseph Mazza and Mr. Herman Wisdom are "employees" or "agents" of Shred-it under the New York City Human Rights Law.

172.     By actions set forth above by Shred-it's employees and/or agents, Shred-it is liable under the New York City Human Rights Law § 8-107(13)(b) which sets forth that:

An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where:

1.   The employee or agent exercised managerial or supervisory responsibility; or

2.   The employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or

3.   The employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

173.   By Mazza's and Wisdom's actions and conduct set forth above, Shred-it engaged in unlawful discriminatory practices.

174.   Mazza and Wisdom are "agents" of Shred-it.

175.   Mazza and Wisdom exercised managerial or supervisory responsibilities with respect to Shred-it.

176.   By Mazza's and Wisdom's actions and conduct set forth above, they engaged in unlawful discriminatory practices.

177.   Defendant Shred-it knew of Mazza's and Wisdom's discriminatory conduct, and acquiesced in such conduct and failed to take immediate and appropriate corrective action.

178.   Upon information and belief, Shred-it did know of Mazza's and Wisdom's discriminatory conduct.

179.   Shred-it should have known of Mazza's and Wisdom's discriminatory conduct.

180.   Shred-it failed to exercise reasonable diligence to prevent the discriminatory conduct of Mazza and Wisdom taken against Ms. Zimmerman.

29

181.    Shred-it is liable for Mazza's and Wisdom's actions and conduct.


# FOURTEENTH CLAIM

### (Interference With Protected Rights Under The New York City Human Rights Law, § 8-107(19))

182.    Ms. Zimmerman repeats and realleges all of the allegations contained herein, as if separately alleged.

183.    Defendants actions set forth above violated § 8-107(19), which sets forth that:

184.    It shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section.

185.    By Shred-it's actions detailed above, Shred-it unlawfully discriminated against Ms. Zimmerman on the basis of her age and gender in violation of the New York State Human Rights Law.

186.    Upon information and belief, Shred-it's conduct towards Ms. Zimmerman was undertaken with reckless indifference to Ms. Zimmerman's rights, entitling her to punitive damages under the New York City Human Rights Law.

187.    As a result of the intentional discrimination described above, Ms. Zimmerman has experienced significant damages in an amount to be determined at trial.


WHEREFORE, while reserving the right to seek additional damages as available, Plaintiff demands judgment against Defendant as follows:

A.  An award of Plaintiff's actual damages in an amount to be determined at trial for loss of compensation and professional opportunities, including an award of back pay;

B.  An award of damages in an amount to be determined at trial to compensate Plaintiff for her mental anguish, humiliation, embarrassment and emotional injury;

C.  An award of liquidated damages;

D.  An award of punitive damages;

E.  An award of reasonable attorneys' fees and the costs of this action;

F.  Pre-judgment and post-judgment interest;

G.  An order directing Shred-it to cease and desist from its discriminatory and retaliatory practices and directing any other applicable injunctive relief; and

H.  All such other and further relief as this Court deems just and proper.

Dated:     New York, New York
           June 19, 2017

                                        Law Office of Andrea Paparella, PLLC

                                        By: _____
                                            Andrea M. Paparella
                                            Siobhan Klassen
                                        150 W. 28th Street, Suite 1603
                                        New York, New York 10001
                                        Telephone: (212) 675-2523
                                        Facsimile: (914) 462-3287
                                        Email: ap@andreapaparella.com
                                               sk@andreapaparella.com

                                        *Attorneys for Plaintiff*

31

# EXHIBIT A

EEOC Form 161 (11/09)

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION ("EEOC")

## DISMISSAL AND NOTICE OF RIGHTS

| To: | Lois Zimmerman<br>110-11 Queens Blvd.<br>Apt. 26-M<br>Forest Hills, NY 11375 | From: | New York District Office<br>33 Whitehall Street – 5th Floor<br>New York, NY 10004 |
|---|---|---|---|

☐    *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2017-00931** | **Patrick Sanford, Federal Investigator** | **(212) 336-3677** |

### THE EEOC IS CLOSING ITS INVESTIGATION OF THIS CHARGE OF DISCRIMINATION ("CHARGE") FOR THE FOLLOWING REASON:

☐    The facts alleged in the Charge fail to state a claim under any of the statutes enforced by the EEOC.

☐    The allegations in the Charge did not involve a disability as defined by the Americans with Disabilities Act.

☐    The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐    Your Charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your Charge

☒    The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the Respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this Charge.

☐    The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this Charge.

☐    Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS of your** receipt of this notice; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Kevin J. Berry*

**Kevin J. Berry,**
**District Director**

JUN 0 1 2017
*(Date Mailed)*

Enclosures(s)

cc:

| Respondent:<br>Shred-it International, Inc.<br>28161 North Keith Drive<br>Lake Forest, IL 60045<br>(847) 367-5910 | Respondent's Attorney:<br>Westerman, Ball, Ederer,<br>Miller, Zucker, & Sharfstein<br>1201 RXR Plaza<br>Uniondale, NY 11556<br>(516) 622-9200 | Charging Party's Attorney:<br>Law Office of Andrea Paparella, PLLC<br>150 West 28th Street<br>Suite 1603<br>New York, NY 10001<br>(212) 675-2523 |
|---|---|---|